IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BEVERLY TAYLOR,

       Plaintiff,

vs.                                                        Civil No. 00-1395 WJ/RLP **ACE**

PATRICIA MADRID, ATTORNEY
GENERAL FOR THE STATE OF NEW MEXICO,
in her individual capacity, KATHERINE VINCENT,
in her individual and official capacities, and
SANDRA WATTS, in her individual and
official capacities,

       Defendants.[1]

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court upon Defendant Madrid's Motion for Summary Judgment, filed November 9, 2001 **(Doc. 44)**, and Defendants Vincent and Watts' Motion for Summary Judgment, filed November 9, 2001 **(Doc. 47)**. Having considered the pleadings, memoranda and other materials submitted by the parties, and the applicable law, I find that both motions are well-taken and shall be granted.

## **BACKGROUND**

Plaintiff ("Taylor") began working at the Attorney General's Medicaid Control Fraud Unit

---

[1] This case was initially assigned to the Hon. Bruce Black, who dismissed claims for money damages against Defendant Madrid in her official capacity, although noting that Plaintiff was reserving the right to add claims for injunctive relief. The Court also dismissed Plaintiff's § 1983 claim that was premised on violations of the state constitution and found that Plaintiff was precluded from maintaining a supplemental state law claim under the New Mexico Tort Claims Act. (Doc. 27).

("MFCU") as an auditor / investigator in late July, 1998. Taylor alleges that Defendants retaliated against her in violation of the first amendment by firing her because she advocated the criminal prosecution of a New Mexico business called Plaza Drugs. Taylor claims that Defendant Madrid refused to allow the criminal or civil prosecution of MFCU as a political favor to Eloy Aragon and his wife, owners of Plaza Drugs who had contributed $160.00 on July 1, 1998, to Madrid's campaign for Attorney General and because of the Aragon's political influence in the Las Vegas, New Mexico area. She further alleges that despite her continuing to speak out about the need to prosecute the case, her investigation was "hampered" because her superiors Assistant Attorney General Katherine Vincent ("Vincent") and Division Director Sandra Watts ("Watts") told her the Plaza Drugs case was not going to be prosecuted.[2]

Investigation into possible overbilling for oxygen by Plaza Drugs in violation of Medicaid billing regulations began on May 19, 1999, as a referral from the Medicaid program to the AG's office. It is not disputed that Plaintiff was frequently vocal about prosecuting the case. On May 31, 2000, following a meeting of her supervisors, Sandra Watts informed Plaintiff that the Attorney General had decided to terminate her at-will employment.[3] While Plaintiff maintains that her termination was politically motivated, Defendants contend that they terminated Taylor because of her unsatisfactory work performance.

---

[2] Vincent was the supervising attorney in the Plaza Drugs case and Watts was one of Plaintiff's unit supervisors. The same set of operative facts control the resolution of the issues in both motions.

[3] The legitimacy of Plaintiff's at-will employment status underscored by Defendants does not eliminate or otherwise affect Taylor's right not to be terminated for reasons that violate the first amendment. See Anderson v. McCotter, et al, 100 F.3d 723, 726 (10th Cir. 1996); Rankin v. McPherson, 483 U.S. 378, 383-84 (1987) (holding that a probationary at-will employee is entitled to First Amendment protection).

*Legal Standards*

To prevail on a claim of retaliation under the first amendment, a plaintiff must prove that (1) the speech in question is protected under the First Amendment and (2) the speech was a substantial or motivating factor in the employer's decision to terminate Taylor's employment. Conaway v. Smith, 853 F.2d 789, 795 (10th Cir.1988) (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Once Taylor meets this burden, an employer may avoid liability by showing that it would have made the same decision in the absence of the protected activity. Childers v. Independent Sch. Dist. No. 1 of Bryan County, Okla., 676 F.2d 1338, 1341 (10th Cir.1982). A two-part inquiry governs the determination of whether speech is constitutionally protected: (1) whether the speech relates to matters of public concern, Connick v. Myers, 461 U.S. 138, 146 (1983); and (2) whether the interests of the public employee in commenting on matters of public concern outweigh the interest of the government employer "in promoting the efficiency of the public services it performs through its employees," Pickering v. Board of Education, 391 U.S. 563, 568 (1968).

*Qualified Immunity*

Once a defendant asserts qualified immunity as a defense, the plaintiff must carry the burden of showing qualified immunity is not proper under the circumstances. Id. To do this, the plaintiff must show that (1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation. Despain v. Uphoff et al, 264 F.3d 965, 971 (10th Cir. 2001). In first amendment cases, the balancing inquiry dovetails into the qualified immunity analysis: the court looks to see whether speech addressed matters of public concern, and then if so, whether the protected nature of the speech was

sufficiently clear that defendants should have known that the employer's interests would not survive a balancing inquiry. See Patrick v. Miller, 953 F.2d 1240, 1246 (10th Cir. 1992). If plaintiff prevails through this point, the analysis resumes with the generic summary judgment inquiry: whether evidence raises genuine issues of material fact as to whether the speech was a substantial or motivating factor in the defendant's decision to terminate plaintiff.

For the reasons set forth below, Defendants are entitled to summary judgment on the basis that Plaintiff has not shown that she engaged in protected speech, and even assuming her speech was protected, Plaintiff has not presented a sufficient factual dispute which would allow a reasonable juror to believe that her termination was politically motivated.

## DISCUSSION

### *Was Taylor's speech protected?*

The facts regarding the actual content of the speech are undisputed. Plaintiff maintains that she was terminated because she "repeatedly pushed for the prosecution of Plaza Drugs" and contends that this speech is constitutionally protected because the Plaza Drugs case involved the government prosecution of medicaid fraud. The prosecution of medicaid fraud cases may be subject matter that has general public interest, but the public concern determination for first amendment purposes does not hinge on general public interest. See Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir.1988). The inquiry must consider whether the form, content and context of the expression is also of public concern. See Rankin v. McPherson, 483 U.S. 378, 384-855 (1987); Wilson v. City of Littleton, 732 F.2d 765, 769 (10th Cir.1984). It is undisputed that Taylor spoke to others in her office quite frequently about her desire to see Plaza Drugs prosecuted: "They've got to be prosecuted. We've got to get them." Pltff's Ex. 7 at 129-130;

4

Pltff's 6 at 124; Deft's F at 34; D at 107 ("They're crooks. They're all crooks. . . we've got to get them all"). None of Taylor's statements suggest malfeasance, corruption or impropriety on the part of a government official -- in this case, the Attorney General.

Plaintiff urges the Court to consider her speech in the context of Madrid's alleged reluctance in investigating the case and in passing along this reluctance to Taylor's superiors who in turn saw her aggressive stance in the Plaza Drugs investigation as a threat to Madrid's directive. The problem here is that Plaintiff's spin on context is not supported by the record. Taylor was not aware of the Aragons' $160.00 contribution to Madrid's campaign until February 2002, nine months after the Plaza Drugs investigation started. Statements by Madrid that she was not "happy" about the investigation and that she would thwart the investigation as a political favor to the Aragons assume different ramifications when viewed against the backdrop of the whole record, as will be discussed. See Copp v. Unified Sch. Dist. No. 501, 882 F.2d 1547,1552 (10th Cir. 1989).

Plaintiff attempts to distinguish Koch v. City of Hutchinson, 847 F.2d 1436, from the instant case. I find that while Koch may not be on point factually because the speech in Koch involved a "routine official report" on an arson, it provides some guidance in its instruction to look at the "point" of the speech in question by inquiring whether the employee meant to bring wrongdoing to light. Koch, 847 F.2d at 1446 (relying on Connick). Plaintiff here overestimates the nature of her speech as constitutionally protected. Her statements do not suggest actual or potential wrongdoing by a government official. Cmp., e.g., Connick v. Meyers, 461 U.S. 138, 148 (1983) ("[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism directed at a public

5

official--would plant the seed of a constitutional case. "). Instead, they demonstrate a dissatisfaction with the speed in which the MFCU was moving on one of the cases in its files rather than to "sufficiently inform" the public in evaluating the conduct of government." See Withiam v. Baptist Health Care of Okla, Inc., et al., 98 F.3d 581 (10th Cir. 1996). Further, the cases offered by Plaintiff in support of her position, see Resp. at 18, contain an element that is lacking in the instant case -- speech which involves the exposing of wrongdoing by government officials.

Plaintiff's case is flawed at the outset. She does not assert the violation of a constitutional right because her speech does not rise to a level of speech which is constitutionally protected. See Clanton v. Cooper, 129 F.3d 1147 (10th Cir.1997) (in analyzing qualified immunity claims, we first ask if a plaintiff has asserted the violation of a constitutional right at all, and then assess whether that right was clearly established at the time of a defendant's actions).

***Taylor's Speech as a substantial or motivating factor.***

Plaintiff could not survive summary judgment on the remaining first amendment elements, even assuming that her speech was considered constitutionally protected. A gap exists between Taylor's termination and the factual evidence she presented to show the Defendants' intentions to squelch the Plaza Drugs investigation.

*Defendant Madrid*

In May 2000, Sandra Watts arranged a meeting with Chief Deputy Assistant Attorney General Bluestone to discuss problems with Taylor's work performance. Also at the meeting were Bob Baca, a former supervising attorney on the Plaza Drugs case and James Stokes, an investigator who was Plaintiff's direct supervisor from 1999 to 2000. Madrid, who makes all the

6

hiring and firing decisions, was contacted after the meeting and gave the directive to terminate Taylor. According to Madrid, her decision was based on the general belief that division directors should be supported in their personnel recommendations. Ex. A at 65; Ex. B at 45-47.

Madrid maintains that she had no knowledge of Taylor's role in the Plaza Drugs case until she filed the instant law suit, and that she was terminated because she threw tantrums, was insubordinate and was difficult to get along with. Defts' Ex. A at 65. Taylor claims that Madrid knew about Taylor's involvement with the Plaza Drugs case and terminated her because Madrid did not want the case investigated. This position rests solely on a June 1999 internal memorandum written by Taylor regarding the Plaza Drugs case, addressed "to" Madrid "through" Sandra Watts. Pltff's' Ex. 9. The memo indicates that although the investigation had so far found some "minor differences" in the quantity of wholesale oxygen sold and the amount purchased, it had not uncovered evidence of overbilling. Contrary to Taylor's contentions, there is no evidence that Taylor was asked to write the memo or that this was the first time such a memo had been generated about a case pending investigation at the unit. Madrid denies ever actually seeing the memo until this litigation, and there is no evidence that Watts, in her meetings with Madrid for a quick overview of cases on which the unit was working, had ever brought up Taylor's name in connection with the Plaza Drugs case.

Taylor attaches an importance to this memo that is simply unsupported by the facts. Madrid's decision to terminate Taylor cannot be connected to her speech if Madrid had no knowledge of Taylor's role in the investigation. See Anderson v. Coors Brewing Co.,181 F.3d 1171, 1179 n.2 (10th Cir. 1999)(adverse action has to come after protected activity, not before).

Taylor offers evidence, based on her statement of additional facts, that Madrid did not

7

want the Plaza Drugs investigation to go forward in order to infer a connection between Taylor's speech pushing prosecution of the case and her termination. In the context of the actual record, this evidence dissipates to one or two immaterial issues of fact. For example, Taylor alleges through several levels of hearsay, that Plaza Drugs was not going to be prosecuted because of a political connection between the Attorney General's office and the Plaza Drug owners:

> In 1999, Joyce Garduño [an MFCU investigator] went to Las Vegas for an investigation. She . . . went to Plaza Drug to ask about the managed care issue. The people at Plaza bombarded her with questions about my investigation. The next day, Ms. Garduño told me that Ramon Montaño (an employee of Plaza) said the Aragons (owners of Plaza) told her they informed Patricia Madrid about my investigation and that she (Madrid) was upset about the investigation and that she (Madrid) told the Aragons that the investigation would go nowhere.

Defts' Ex. N (response to Interrogatory No. 9). Aside from their obvious evidentiary shortcomings, see Lancaster v. Indep.Sch. Distr. No. 5, et al., 149 F.3d 1228, 1236 (10th Cir. 1998) (citation omitted), those statements do not clearly link Madrid to the accusations. In fact, in her deposition, Ms. Garduño stated that the references pertained to the former Attorney General and not Madrid. See Ex. J at 19, 23, 26; Ex. 11 at 46, 47, 51. [4]

There is no evidence that Madrid met with the Aragons after her campaign stop in Las Vegas in July 1998 when she received a contribution of $160.00 and there is no evidence of any contact by letter or phone or in person by the Aragon's attorney during the Plaza Drugs investigation except one time to permit an extension of time for producing some documents. Ex.

---

[4] In connection with this alleged conversation, Taylor attributes to Bob Baca the comment that Madrid would quash the Plaza Drugs investigation as a political favor to secure a huge block of votes. Ex. 1 at 58. Even if Baca's statement were admissible for summary judgment purposes, it hardly establishes factual evidence for a dispute in fact over the reason for Taylor's termination.

1, 73-74. Taylor's contention that Madrid absolutely would not allow Plaza Drugs to be prosecuted criminally is lifted out of context from her actual statements. Madrid did question why the MFCU was going after a small "mom and pop" business, and did not "particularly like the case" -- but directed the staff to "go forward" or "keep going" with the investigation. Ex. 6 at 121-22, 123; Ex. D at 122, 166. At the same time, Taylor does not present evidence to dispute Defendants' claim that there were problems with collecting the right kind of evidence to criminally prosecute the case. See Ex. F at 34-35, 76; E at 114.

After sifting through Taylor's list of factual evidence, what remains are two allegations: (1) Taylor states that she was told by Defendant Vincent not to involve the FBI in the investigation when Taylor sought to interview Ramon Montaño, who worked for Plaza Drugs, Pltff's Add'l Fact No. 24, and (2) Vincent's statement that she intended to let the Plaza Drugs case sit among the stacks of cases in her office until the statute of limitations ran, Add'l Fact No. 28 -- statement which Vincent denies. Ex. E at 130. I do not consider these alleged statements by Taylor to support an inference that Madrid actually was aware of Taylor's involvement in the Plaza Drugs investigation, or that Taylor was terminated because of retaliation for her speaking out about the case.

*Defendants Watts and Vincent*[5]

---

[5] Defendants initially suggest that because Watts and Vincent did not make the decision to terminate Taylor, they should not continue as defendants in the case. However, taking Plaintiff's allegations as true regarding their roles in recommending her termination, Taylor alleges sufficient minimal personal involvement to require their presence in a § 1983 action. See Meade v. Grubbs, 841 F.2d 1512, 1527-27 (10th Cir. 1988) (plaintiff must allege some personal involvement by a defendant in the constitutional violation). Ultimately, I do not find that their conduct was motivated by retaliation for Taylor's speaking out on the Plaza Drugs case, even though Madrid relied on their representations and recommendations in her decision to terminate Taylor.

Defendants offer evidence on Taylor's substandard work performance, which they claim was the basis for her termination, by way of deposition. They contend that Plaintiff failed to follow police and agent procedures, was insubordinate and objected to directives by supervisors. Defts' Ex. B at 42. Sandra Watts never observed these problems, but she had been told that Taylor could not get along with others in the office and that she was difficult to get along with personally. Pltff's Ex. 6 at 127-28, 132. James Stokes felt that Taylor was overeducated, loud, boisterous and rude. Deft's Ex. G at 81-82. He described an instance when Taylor became loudly argumentative when she was asked to obtain a trial subpoena, insisting it should be a different form of subpoena. At 87-88.[6] Vincent told Watts that Taylor would become involved in "screaming fights" and that she would scream "at the top of her lungs." Pltff's Ex. 6 at 142.

Vincent initially thought that Taylor would be a "very aggressive, intelligent investigator." As time passed, Vincent observed that

> Taylor became "very defensive about her work, to the point of being almost combative with me, and I also saw her get into disagreements with other individuals. I knew that other individuals did not want to work with her. She wanted cases pursued "the way she prepared them and not . . . with the evidence in the reports, the information that we needed in order to take a case into court, . . . and became very defensive about her work, to the point of, you know, creating arguments, and they led to quite a few ugly scenes in the office."

Ex. E at 112-114. Watts relayed all this information to Madrid, including that Taylor "threw tantrums, that she . . . fought with the other people in the unit, that she refused to follow instructions, that she was insubordinate, and that she was generally abusive to Sandy." Ex. A at 65.

Plaintiff notes that Watts never discussed any of these complaints with her and points to a

---

[6] Taylor was a licensed attorney, although her position at MFCU was not in that role.

work performance evaluation dated July 1999 which indicates that Taylor "exceeded expectations" in her work performance. Ex. 15. However, considering this in the context of the undisputed facts, this evaluation does not damage Defendants' position. Defendants admit there was little problem with Taylor's performance during her first year of employment while under the supervision of Stokes' predecessor, Jose Arguello. Ex. 6 at 105-06.[7] Subsequent work appraisals covering the period during which Defendants complain about Taylor's work performance are not available. Defendants explain (and Plaintiffs do not dispute) that both supervisor-generated evaluations and progressive disciplinary measures were reserved only for classified employees. In this context, I find that the July 1999 work evaluation is not sufficient to establish a dispute of material fact support Plaintiff's contention that her termination was politically motivated. Moreover, the July 1999 work evaluation is not enough to overcome Defendants' position that Taylor would have been terminated anyway regardless of her speaking out on the investigation and prosecution of Plaza Drugs.

## CONCLUSION

In sum, I find that Defendant Madrid and Defendants Watts and Vincent are entitled to summary judgment because Plaintiff's speech was not a matter of public concern which would trigger constitutional protection under the first amendment. I also find that, even assuming the speech was protected, Plaintiff has not presented a disputed issue of material fact that would allow a reasonable juror to conclude that this speech was a substantial or motivating factor in her termination.

---

[7] The Plaza Drugs investigation started a couple of months prior to Arguello's departure from the job.

**IT IS THEREFORE ORDERED** that Defendant Madrid's Motion for Summary Judgment **(Doc. 44)**, and Defendants Vincent and Watts' Motion for Summary Judgment **(Doc. 47)** are hereby GRANTED and that this case is DISMISSED WITH PREJUDICE.

JUDGMENT for Defendants shall be entered contemporaneously with this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE